# In the United States Court of Federal Claims

No. 12-731C
(Originally Filed: February 22, 2013)
(Reissued: February 28, 2013)[*]

* * * * * * * * * * * * * * * * * * * *

ADAMS AND ASSOCIATES, INC.,

                                    *Plaintiff*,

v.

THE UNITED STATES,

                                    *Defendant*.

Bid protest; Job Corps Centers; Small Business Set-Asides; Statutory Construction; Rule of Two; Fair Proportion Analysis; Workforce Investment Act

* * * * * * * * * * * * * * * * * * * *

*Gail Lindsay Simmons*, Washington, DC, and *Hopewell H. Darneille III*, Washington, DC, for plaintiff.

*Won Kyu Lee*, Civil Division, Department of Justice, Washington, DC, with whom are *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director, for defendant. *David R. Koeppel*, Department of Labor, Washington, DC, with whom is *Peter J. Dickson*, of counsel.

———————

OPINION

———————

---

[*] This opinion was originally filed under seal. Publication was deferred pending parties' review for redaction of protected material. After considering the parties' proposed redactions, the court adopted some of the suggested redactions, which are indicated by brackets, and made other minor editorial changes. The opinion is now prepared for release.

BRUGGINK, *Judge*.

This is a pre-solicitation protest of the Department of Labor's ("DOL") decision to designate the contract for operation of the Shriver Job Corps Center ("Shriver") as a small business set-aside. Plaintiff, Adams and Associates, Inc., ("Adams") is the incumbent contractor. Because of the small business size limitations placed on the follow-on procurement, Adams will be precluded from competing.

Currently before the court are the parties' cross-motions for judgment on the administrative record, plaintiff's motion to strike the declarations of Ronald Daitoku and E. Thomas Pendleton, and plaintiff's motion for leave to notify the court of the suspension of all Job Corps Center enrollment. The motions are fully briefed, and we heard oral argument on February 6, 2013. We issued an opinion in a related matter, *Dynamic Educational Systems, Inc. v. United States*, 12-730C, slip op. (Fed. Cl. Feb. 15, 2013) ("*DESI*"), contemporaneously. Plaintiff in *DESI* made the same legal arguments as in this case and also argued from a set of facts derived from the administrative records of both cases and additional material it appended to its motion for judgment on the administrative record. Our disposition of the claims in *DESI* is fundamentally the same as the analysis and outcome in the present case. For the reasons explained below, we grant defendant's motion for judgment on the administrative record, and deny plaintiff's cross motion.

## BACKGROUND

I.     What constitutes the administrative record?

The parties were not agreed on what constitutes the administrative record ("AR"). As we explained in *DESI*, the issue has been complicated for three reasons. First, the decision to set aside the procurement for small businesses, although nominally ordered by Edmond Thomas Pendleton, the Contracting Officer for the Shriver center, was at a minimum done in close coordination with Jillian Matz, the Division Chief for the Division of Job Corps Procurement in the Office of Contracts Management ("OCM"), which is within the Education and Training Administration at the Department of Labor ("ETA DOL"). The initial record produced by the government was limited to what Mr. Pendleton had before him. Second, the decision to set aside the Shriver center arose from the sources sought notice (also known as a Request for Information or RFI) for five centers; i.e., not just the Shriver

center.  Third, plaintiff's challenge to the "Rule of Two"[1] determination, which set aside operation of the Shriver center for small businesses only, includes the argument that it was irrational because the decision-makers (Ms. Matz at the headquarters level) knew two relevant things not reflected in the record: that there were dozens of other job center operation contracts around the country being solicited contemporaneously; and second, that there were no more than a handful of small businesses capable of performing the work.

In short, from plaintiff's perspective, the administrative record should include everything that Ms. Matz and others at the headquarters level knew about all Job Corps Center contracts being solicited and the numbers of small businesses either responding to RFI's or to solicitations, or awarded contracts. We declined to order that level of supplementation, although we did order defendant to furnish all of the material generated in connection with the RFI that included the Shriver center.

Plaintiff, meanwhile, included an appendix to its motion for judgment on the administrative record, which included, among other things, materials to which it had access from a similar RFI involving the Job Corps Center in Gadsden, Alabama.  We ordered defendant to inform the court of two things about the material in plaintiff's appendix: whether it was available to the decision-makers on the Shriver RFI; and whether it was considered by the decision-makers on the Shriver RFI.  Our assumption was that, if materials in plaintiff's appendix were both available to the decision-makers and considered by them in making the set-aside decision, then those materials should have been included in the administrative record.

Defendant offered the affidavit of Mr. Pendleton in response to the court's inquiry.  In substance, he states that he did not consider or rely on any of the documents in plaintiff's appendix when he made the decision to set aside the Shriver contract.  Decl. E. Thomas Pendleton ¶ 9, Jan. 31, 2013.  Mr. Pendleton, however, does concede that he was generally aware of other set-asides occurring contemporaneously with Shriver.  *Id.* ¶ 10.  Defendant also offered the affidavit of Ronald Daitoku, Procurement Analyst in OCM headquarters, who participated early on in the set-aside analysis by reviewing all interested party submissions to the RFI that included Shriver and creating

---

[1] Federal Acquisition Regulation part 19.502-2(b) is the source of the Rule of Two and will be discussed in detail below.

a spreadsheet with his analysis of responding businesses' relevant experience. Decl. Ronald Daitoku ¶¶ 1, 3, Jan. 31, 2013. He states that when he analyzed each company's relevant experience and created the spreadsheet, he only considered the responses submitted to the RFI. *Id*. ¶ 4.

Both affidavits deny that any of the documents in plaintiff's appendix were relied upon when making the set-aside determination. Yet, the declarants acknowledge that any of the RFIs, Pre-solicitation Notices, Solicitations, and Award Notices for Job Corps Centers that were posted on the Federal Business Opportunities website were publicly accessible and therefore theoretically available to each of them. Mr. Daitoku admits to having access to an initial set-aside analysis conducted for the Job Corps Center in Gadsden, Alabama and to the Outcome Measurement System data, which measures performance outcomes at each center. Daitoku Decl. ¶ 5, 8. Mr. Pendleton denies having access to this data, but plaintiff avers that slightly altered forms of the information are publicly available. *See* Pendleton Decl. ¶ 6. Plaintiff included the Outcome Measurement System data in its appendix because, it alleges, the data demonstrates the flawed record that small businesses have accumulated in operating Job Corps Centers. While all of this information was available to Mr. Pendleton and Mr. Daitoku, they did not consider it in making the set-aside decision for Shriver.

Noticeably absent is any response on behalf of Ms. Matz. Defendant takes the position that she was not one of the "decision-makers" on the Shriver set-aside.

To clarify our position with respect to the affidavits, we will take them into consideration for one purpose: to determine which of the materials included in plaintiff's appendix should be viewed as part of the administrative record, i.e., if they were both available and taken into consideration.[2] As

_____

[2] Defendant has not formally asked us to consider the affidavits as part of the administrative record, unlike the position it took in *DESI*. *See DESI*, slip op. at 5, 32-33. However, we have reviewed them, as we did in *DESI* in order to determine whether the materials in plaintiff's appendix were either available to or taken into consideration by the decision-makers for the Shriver center. Although we have considered the affidavits in order to understand what happened at the agency level, there is no need to considered them further.

(continued...)

defendant noted in *DESI*, it is appropriate to fill "a gap in the administrative record" to avoid frustrating effective judicial review.  Def.'s Mot. Supp. AR Jan. 14, 2013 at 3; *DESI*, No. 12-730, slip op. (Fed. Cl. Feb. 25, 2013) (citing *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (2009)).  We therefore deny plaintiff's motion to strike the declarations of Mr. Pendleton and Mr. Daitoku to the extent that the affidavits reveal whether the material attached to plaintiff's appendix was relied on or considered.

As to the lack of an affidavit from Ms. Matz, and with respect to the bulk of the material in plaintiff's appendix, which was either not available to Mr. Pendleton or Mr. Daitoku, or not considered by them, we acknowledge the substance of the material and the fact of no response from Ms. Matz in connection with plaintiff's arguments that the Rule of Two decision for Shriver could not be made in a vacuum, and that the criteria used for the Rule of Two evaluation in Shriver were insufficient.

In other words, if plaintiff is correct, for example, that it is relevant that the Gadsden material shows both the same small businesses appearing in response to that solicitation and that different standards were used by the agency for applying the Rule of Two test, then we would have to consider ordering the agency to supplement the existing administrative record.  If, on the other hand, it would make no difference whether expanding the administrative record showed that there is a small pool of interested small businesses or that the use of a different standard for evaluating small businesses was used for a different procurement, then the absence of the material in the administrative record is also irrelevant.  We will rule on whether plaintiff's appended material should be properly part of the administrative record when we evaluate whether it would be outcome determinative to the Rule of Two analysis.

We will not take into the administrative record plaintiff's notice of February 4, 2013, to the effect that budget constraints have resulted in the suspension of enrollment of new students at all Job Corps Centers.  We view that as irrelevant to any questions before the court.

---

[2](...continued)
Even if we considered plaintiff's materials, they would not effect the outcome.

II.     Factual Background

Adams currently operates the Shriver Job Corp Center in Devens, Massachusetts under contract DOLJ08AU00002, which runs from June 1, 2008, until May 31, 2013.  AR 68.  Shriver is a job training facility with a capacity of 102 residential female students, 170 residential male students, 14 non-residential female students, and 14 non-residential male students.  AR 7.  The annual cost to run Shriver ranges from $7 to $17 million.  AR 72.  In addition to operations, the contract includes outreach, admissions, and career transition services.  AR 70.  The total value of the contract is $47,850,418.00 for two years of services and three option years.  AR 68, 70.

Before issuing a formal solicitation for a new contract, the Department of Labor Employment and Training Administration, through its Office of Contracts Management, published a Sources Sought Notice for Request for Information DOL121RI20504 ("sources sought notice") on April 26, 2012.  AR 1.  The purpose of a sources sought notice is to conduct market research regarding the businesses, specifically small businesses, that operate in a particular industry and that might be willing to compete for the work.

As part of the RFI, and pursuant to Federal Acquisition Regulation ("FAR") part 19.303(a), the contract for operation of a Job Corps Center was assigned an industry category code: NAICS 611519.  *See* 48 C.F.R. § 19.303(a) (2012); AR 1, 3.  Each industry category is assigned a code through the North American Industry Classification System ("NAICS") maintained by the Office of Management and Budget ("OMB").  Using the already established NAICS codes, the Small Business Administration ("SBA") then imposes its own limitation on size and revenue to determine which entities can be considered "small" within any industry category.  13 C.F.R. § 121.201 (2012).  Respondents to either a RFI or later to a solicitation indicate whether they should be considered small businesses in light of the particular dollar limits for the job category identified by the contracting officer.

By selecting NAICS code 611519 (the only one applicable to Job Corps Centers) the agency dictated the small business revenue limit associated with that code, which was no more than $35.5 million in annual receipts.  AR 3; 13 C.F.R. § 121.201.  Therefore, if the contract for the operation of Shriver were designated for small businesses only, any business with more than $35.5 million in annual receipts would be unable to qualify.  Adams has receipts in excess of $35.5 million and thus would be ineligible.  *See* AR 68.

The sources sought notice was not solely for Shriver. Rather, it sought market information regarding five Job Corps Centers: Shriver, Tulsa, New Haven, San Diego, and Sacramento. AR 7-8.

Around the same time that the RFI applicable to Shriver ("RFI-S") was issued, a second sources sought notice was prepared and issued regarding the operation of seven other centers: Paul Simon, Montgomery, Dr. Benjamin L. Hooks, Detroit, Joliet, Earle C. Clements, and Little Rock Job Corps Centers ("RFI-M"). *See* AR 187, 202-03, 210. Both RFIs were prepared and released by OCM, which is located in Washington, DC. *See* AR 3. At OCM, there is a division exclusive to Job Corps Center procurements. Ms. Matz is the Division Chief for the Division of Job Corps Procurement within OCM. *See* AR 172, 201. Responses to both RFIs were directed to Mr. Daitoku and Ms. Peni Webster-Lewis, who are both Procurement Analysts with OCM in its Washington Headquarters office. AR 7. OCM also operates through regional employees. Mr. Pendleton, the Branch Chief and Contracting Officer for the Boston Region, was eventually tasked with making the set-aside decisions for Shriver and New Haven. AR 70, 137-38. In sum, through the two sources sought notices OCM sought market information on a total of twelve Job Corps Centers. AR 202-03.

RFI-S explained that "Job Corps is a national residential training and employment program administered . . . to address the multiple barriers to employment faced by at-risk youth throughout the United States." AR 4. The proposed contract would be a cost-reimbursement type with an incentive fee. AR 3. The services sought included "educational and career technical skills training," operating the residential facility, providing meals and supervision for the residents, job placement and development, health services, career transition support services, community outreach, recruitment, and center oversight and management. AR 4. Although the sources sought notice was not limited to small businesses, ETA encouraged "ALL QUALIFIED SMALL BUSINESSES INCLUDING 8(A) FIRMS . . . TO PARTICIPATE." AR 3. The notice directed each interested business to submit a capability statement to Mr. Daitoku, Procurement Analyst with the Office of Contracts Management DOL,[3] indicating business size classification and the Job Corps Center or Centers in which the business had an interest. AR 6-7. Potential

---

[3] Ms. Webster-Lewis was listed as the secondary point of contact. AR 7.

contractors were asked to include in the capability statement their prior experiences running comparable facilities, providing similar services, and operating with comparable financial resources.  AR 5-6.  Specifically, OCM requested responses to the following fourteen capability requirements:

1.  Experience providing a comprehensive academic and career technical training program.

2.  Experience providing food services, medical, dental, and mental health care.

3.  Experience managing and ensuring data integrity.

4.  Experience protecting Personally Identifiable Information, whether on paper, in electronic form or communicated orally. In accordance with the Privacy Act of 1974, as amended.

5.  Experience with facility and construction management.

6.  Experience providing property management.

7.  Experience providing residential management, residential supervision, and meals.

8.  Experience operating a program that is integrated with the local workforce development systems, employers and the business community.

9.  Experience operating a job training program that reflects the local labor market conditions of the place of contract performance.

10.  Experience operating a job training program that is reflective of the workforce investment plans of the state where the program is located and experience taking part in the local workforce investment system of the program's local [sic].

11.  Access to financial resources sufficient to satisfy requirements of operating a [Job Corps Center with outreach, admissions, and career transition services] for the first 45 days

of operation or the ability to obtain them, e.g., a seven-figure bank line of credit, evidence of a positive cash flow, etc.

12. Experience with the financial management of a cost reimbursement type contract.

13. Experience providing outreach, recruitment, and enrollment of youth in a training program.

14. Experience providing job placement, job development, and transition services.

AR 5-6. OCM reserved "the right to compete any acquisition resulting from this survey among small businesses or to make award to an 8(a) firm, based on the responses received." AR 3.

OCM received capability statements from six businesses in response to the sources sought notice that included Shriver. AR 19. Not all of the businesses that responded were small. The number of small businesses currently operating Job Corps Centers is limited. As of September 18, 2012, there were four independent small businesses[4] and five subsidiary small businesses[5] that operated 16 out of 125 Job Corps Centers. AR 812-17. There are two other companies, Education and Training Resources and Horizons Youth Services, that operate Job Corps Centers under contracts that were small business set-asides but have outgrown the small business designation. AR 814. The following chart shows the size classification of each business that responded and the Job Corps Centers in which it was interested:

| Company Name | Expressed Interest in these Job Corp Centers | Business Size |
|---|---|---|
| | | |

---

[4] Those four small businesses are Career Opportunities, Inc., Education Management Corporation, Odle Management Group, LLC, and Serrato Corporation. AR 812-16.

[5] The subsidiaries are Alutiiq Education and Training, Alutiiq Professional Services, Chugach Education Services, Inc., Chugach Government Services, Chugach World Services. AR 812-13.

9

| [                    ] | **Shriver**<br>Tulsa<br>Sacramento | Small Business |
| [                    ] | **Shriver**<br>New Haven<br>San Diego | Small Business |
| [                    ] | **Shriver**<br>Tulsa<br>New Haven<br>San Diego<br>Sacramento | Small Business |
| [                    ] | **Shriver**<br>New Haven<br>San Diego<br>Sacramento | Small Business |
| [                    ] | Did not specify | Small Business |
| [                    ] | **Shriver** | Large Business |

AR 91, 186, 211.  As the chart shows, there were four responses from small businesses expressing interest in Shriver.  AR 91.

After Mr. Daitoku received the responses, a determination memorandum addressing all five centers was generated in OCM.  AR 91. Additionally, a DL1-2004 form was created for each center, which contained information about the originating agency (OCM), the contract value and period of performance, whether the procurement will be conducted as a set-aside, the NAICS code and small business size standard, past procurement history, and a section in which DOL's Office of Small and Disadvantaged Business Utilization ("OSDBU") Representative may state whether he or she concurs with the chosen procurement method.  AR 68.  On June 1, 2012, Mr. Daitoku e-mailed this memo, an analysis chart, and a partially completed DL1-2004 form for each of the five Job Corps Centers to Ms. Matz, Division Chief for the Division of Job Corps Procurement, and Regional Contracting Officers Mr. Pendleton and Sheryl Algee.  AR 203.  The administrative record does not reveal the content of this initial set-aside memo, but the outcome would have

been determined by application of the Rule of Two[6] to the market research as shown in the above chart. *See* 48 C.F.R. § 19.502-2(b). So long as they each agreed to the contents of the memo, Mr. Daitoku asked Mr. Pendleton to sign the DL1-2004 forms for Shriver and New Haven, Ms. Algee to sign the DL1-2004 form for San Diego and Sacramento, and Ms. Matz to sign the remaining DL1-2004 form for Tulsa and the memo. AR 132.

Mr. Pendleton responded to Mr. Daitoku's request with the following: "These two [Shriver and New Haven] are hard to swallow. I'll sign and return them soon." AR 136. Mr. Pendleton signed the DL1-2004 form for Shriver on July 19, 2012. AR 138. Mr. Pendleton was aware that there were multiple RFIs resulting in several contracts being set-aside and directed three DOL employees, including Michael Bolden, Contract Specialist at OCM, to draft set-aside memoranda for the individual centers. AR 139-40; *see* AR 95. Mr. Bolden drafted the set-aside determination memorandum for Shriver, which he sent to Mr. Pendleton on August 24, 2012. AR 144-45. Mr. Pendleton forwarded the signed set-aside memorandum to Ms. Webster-Lewis on August 28, 2012, for submission to the OSDBU. AR 146, 148. OSDBU concurred in the set-aside determination for Shriver on September 7, 2012. AR 68.

Based on the capability statements received pertaining to Shriver, Mr. Pendleton determined that [                    ], [                    ], and [                    ] were unable to perform the contract. AR 72. According to Mr. Pendleton, [                    ] did not possess adequate financial resources to operate a Job Corps Center with additional service components, like Shriver. AR 72. Mr. Pendleton did not find [                                        ] responsible because "it was unclear from the capability statement provided by [    ] whether the company possessed all 14 of the required capabilities." AR 72. Lastly, [                    ] did not address all fourteen criteria in its response and Mr. Pendleton was thus unable to discern whether it was a responsible entity with sufficient financial resources to operate a center. AR 72. He did, however, deem the remaining small businesses, [                                ] and [                                ],

---

[6] The Rule of Two states: "The contracting officer shall set aside any acquisition over $150,000 for small business participation when there is a reasonable expectation that: (1) Offers will be obtained from at least two responsible small business concerns . . . ; and (2) Award will be made at fair market prices." 48 C.F.R. § 19.502-2(b) (2012).

potentially responsible to perform the contract under all fourteen capability requirements. AR 73. In his analysis, Mr. Pendleton noted that the two small businesses deemed responsible either currently operate or have recently operated a Job Corps Center,[7] and he therefore "anticipated that similar small businesses will provide a competitive proposal that is based on fair market price." AR 73. Thus, Mr. Pendleton concluded that both requirements for setting aside the contract for a small business pursuant to FAR part 19.502-2 had been met. AR 73. On September 7, 2012, the DL1-2004 form was completed by signatures from the Contracting Officer, Mr. Pendleton, as well as by a representative from the OSDBU. Operation of the Shriver center was designated as a 100 percent small business set-aside.[8] AR 73. OCM issued a pre-solicitation notice on October 16, 2012, announcing to the public that it anticipated issuing the solicitation for Shriver on October 31, 2012, as a 100 percent small business set-aside. AR 92, 94.

Plaintiff filed its complaint here on October 26, 2012. It sought a preliminary injunction to prevent the agency from issuing a solicitation for operation of the Shriver center, which we denied. The solicitation, DOL12QA20003, went forward as a small business set-aside on December 14, 2012. AR 226. While the initial pre-proposal conference and walk-through for prospective bidders was cancelled, it was rescheduled and held on January 4, 2013. AR 96, 222, 811. Proposals were received until February 14, 2013. AR 222. Defendant did agree, however, that it would not award any contract arising from that solicitation until after the court rules.

DISCUSSION

I.   Jurisdiction

Plaintiff raises three challenges to the set-aside determination. Two are based on alleged violations of statutes. It contends that, before a procurement may be set aside for small businesses, the procuring agency, in this case DOL acting through Mr. Pendleton, had to make a preliminary determination

---

[7] [ . . . . ]

[8] Under FAR part 6.203, contracts may be set aside for small businesses to fulfill statutory policies relating to small business concerns. 48 C.F.R. § 6.203.

pursuant to 15 U.S.C. § 644(a) (2006) ("Section 644"), that a "fair proportion" of work in that industry category should be set aside for small businesses. Plaintiff contends that the set-aside is fatally flawed because that determination was not made.

Plaintiff also contends that the agency's small business set-aside decision, based on application of the Rule of Two determination called for by FAR part 19.502-2(b), constituted a violation of the Workforce Investment Act, Pub. L. No. 105-220, 112 Stat. 936 (1998) ("WIA") (amending various sections codified throughout Title 29). It asserts that any set-aside for small business would violate the larger concerns for open competition mandated by WIA. Finally, plaintiff argues that, even if FAR part 19.502-2(b) is not incompatible with WIA, its application here was arbitrary and capricious.

Pursuant to the Tucker Act, we have jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award . . . or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). DOL ETA's decision to designate the contract as a small business set-aside is made "in connection with" a proposed procurement, and plaintiff alleges that the decision was made in violation of applicable statute and regulations and was arbitrary and capricious. *See Sys. Appl'n & Techs. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012) (stating that the court has jurisdiction over "objections related to a statutory or regulatory violation so long as those objections are in connection with a procurement or proposed procurement"). As to all of plaintiff's claims, therefore, we have subject matter jurisdiction.

To establish economic interest or prejudice in a pre-award protest, however, plaintiff also must demonstrate "a non-trivial competitive injury which can be addressed by judicial relief." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1362 (Fed. Cir. 2009). Plaintiff need only show "a direct economic stake in the solicitation being carried out in accordance with applicable laws and regulations." *Id*. At least with respect to its arguments directed at the agency's application of the Rule of Two, Adams is an "interested party" because the set-aside determination prevented Adams, the incumbent, from competing for the upcoming contract. "A deprivation of an opportunity to compete is sufficient economic harm to demonstrate prejudice for purposes of standing." *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 533 (2010). Plaintiff is the incumbent contractor and a prospective

bidder "whose direct economic interest would be affected by the award of the contract." *Am. Fed'n of Gov't Empls., ALF-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting 31 U.S.C. § 3551(2) (Supp. IV 1998)).

Unlike the companion case, *DESI*, defendant did not file a motion to dismiss for lack of jurisdiction, although it does argue in its initial and response briefs that plaintiff lacks standing. Defendant challenges plaintiff's standing only with respect to plaintiff's claim that the DOL never made the fair proportion determination contemplated by Section 644. Defendant advances two arguments in that regard: 1) that DOL's implementation of Section 644's "fair proportion" determination consists exclusively of high level policy judgments and non-procurement activities and is thus beyond the court's jurisdiction; and 2) Adams lacks standing to challenge any such policy determinations or non-procurement related activities because a change in the fair proportion analysis cannot be shown to benefit Adams. In *DESI*, we denied the motion to dismiss, slip op. at 28, and, even if properly made here, we would deny the motion for the same reasons.

In principle we can agree with the assumption underlying both aspects of defendant's jurisdictional arguments. If the Section 644 fair proportion determination is fundamentally a policy judgment reflected in decisions of the Executive Branch, which are not directly connected to particular procurements, then the court would be without jurisdiction. We could rephrase the argument or perhaps add to it ourselves: if the fair proportion determination is purely one of "policy," then there are no judicially enforceable means to evaluate a "proper" determination. We could not order a remedy that the court could meaningfully evaluate or enforce. These considerations admittedly provide support for defendant's argument that there is no judicially enforceable remedy. Nevertheless, determining whether this assumption is correct requires some examination of the broad framework that has evolved in the last sixty years for introducing small business preferences into the procurement apparatus for executive agencies. We have jurisdiction to conduct this examination and, therefore, we decline to dismiss plaintiff's fair proportion claim.[9]

---

[9] If plaintiff had been successful on the merits of its fair proportion argument, then we would have had cause to reconsider whether we have jurisdiction to disturb a policy decision.

II.     Substantive Arguments

A.  Section 2887

One provision of WIA, found at 29 U.S.C. § 2887(a)(2)(A), provides, "Except as provided in subsections (a) to (c) of section 3304 of Title 41, the Secretary shall select on a competitive basis an entity to operate a Job Corps center."  29 U.S.C. § 2887(a)(2)(A) (2006 & Supp. V 2011).  Plaintiff contends that the phrase "competitive basis" means "full and open competition," i.e., open to large as well as small businesses.  We recently rejected that argument in *Res-Care, Inc. v. United States*, 107 Fed. Cl. 136, 141-42 (2012).  We concluded that, although setting aside a procurement only for a small businesses does limit competition, it is not a non-competitive process.  We held that, "small business set asides are competitive." *Id.* at 142.

Plaintiff here attempts to make a related argument that was not squarely addressed in *Res-Care.*  It adds a reference to 29 U.S.C. § 2887(a)(1)(A), which provides that the Secretary of Labor "shall enter into an agreement with a Federal, State, or local agency, an area vocational education school or residential vocational school, or a private organization, for the operation of each Job Corps center."  Plaintiff argues that "Congress intended for [Job Corps Center] operators to be chosen on a competitive basis among all eligible entities, and granted no authority to limit the pool of eligible entities" except as provided in 41 U.S.C. § 3304(a)-(c) (Supp. V 2011). Pl.'s Mot. J. AR 25. Plaintiff states that any regulation to the contrary is not entitled to deference. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843-45 (1984).

We disagree.  We see no reason to revisit our holding in *Res-Care.*  The list of eligible entities found in 29 U.S.C. § 2887(a)(1)(A) (2006 & Supp. V 2011) is just that: a list of entities eligible to be chosen to operate a Job Corps Center.  As defendant points out, there is nothing in the list which dictates that every procurement should be open to all types of entities.  We note, moreover, that Congress specifically adopted preferential procurement programs for small businesses in order to promote competition:

> The essence of the American economic system of private enterprise is free competition. Only through full and free competition can free markets, free entry into business, and opportunities for the expression and growth of personal

15

> initiative and individual judgment be assured. . . . It is the
> declared policy of the Congress that the Government should aid,
> counsel, assist, and protect, insofar as is possible, the interests
> of small-business concerns in order to preserve free competitive
> enterprise, to insure that a fair proportion of the total purchases
> and contracts or subcontracts for property and services for the
> Government . . . be placed with small-business enterprises, to
> insure that a fair proportion of the total sales of Government
> property be made to such enterprises, and to maintain and
> strengthen the overall economy of the Nation.

15 U.S.C. § 631(a) (2006).

In addition, plaintiff argues that the regulation directing ETA to apply the FAR to Job Corps procurements, 20 C.F.R. §§ 670.300-670.320 (2012), is unenforceable. The Job Corps specific regulation at issue provides that "the Federal Property Administrative Services Act of 1949," "Federal Acquisition Regulation (48 CFR Chapter 1)," and "DOL Acquisition Regulation (48 CFR Chapter 29)" apply to the procurement and selection of an entity "to operate contract centers." 20 C.F.R. § 670.310(a); *see* 20 C.F.R. § 670.320. By referring to the FAR and DOLAR, these regulations make possible the application of the Rule of Two in procurements for Job Corps Centers. *See* 48 C.F.R. §§ 19.502-2, 2919.502 (2012). Plaintiff claims that these regulations were enacted *ultra vires* because DOL's statutory authority to promulgate 20 C.F.R. part 670, 20 U.S.C. § 9276(c) (2006), expired on December 31, 1999, before part 670 was adopted in its current form.

In order to transition to the system adopted by WIA, the Secretary of Labor was given authority in 20 U.S.C. § 9276(c) to promulgate final regulations, which were to be "developed and published in the Federal Register" no later than December 31, 1999. The final rule was not promulgated until August 11, 2000. Workforce Investment Act, 65 FR 49294-01 (Aug. 11, 2000). However, the ETA provides the following explanation for the delay:

> the Act required the Secretary of Labor to issue this Final Rule
> implementing provisions of the WIA under the Department's
> purview by December 31, 1999. While we were unable to meet
> this deadline, we have endeavored to issue this Final Rule as
> expeditiously as possible without compromising the quality of

> the document. Under Secretary of Labor's Order No. 4-75, the Assistant Secretary for Employment and Training has been delegated the responsibility to carry out WIA policies, programs, and activities for the Secretary of Labor. We have determined that this Final Rule, as promulgated, complies with the WIA statutory mandate to issue a Final Rule and provides effective direction for the implementation of WIA programs.

Workforce Investment Act, 65 FR 49294-01 (Aug. 11, 2000). The agency treated the deadline as a goal, not a pre-condition to maintenance of rule-writing authority. We will not disturb that conclusion. The court's bid protest jurisdiction does not extend to striking down regulations. While we could refuse to enforce a regulation that was squarely at odds with mandatory procurement procedures set out by statute, that is not the case here. *See Schism v. United States*, 316 F.3d 1259, 1285 (Fed. Cir. 2002); *Tasker v. United States*, 178 Ct. Cl 56 (1967). We do not view the possibility that DOL was late in enacting a regulation as an "alleged violation of statute or regulation in connection with a procurement." 28 U.S.C. § 1491(b)(1) (2006).

In any event, 20 U.S.C. § 9276(c) (2006) was not the Secretary of Labor's only source of authority to enact regulations implementing the WIA. Title 29 of the United States Code empowers the Secretary to "prescribe rules and regulations to carry out this chapter," which includes 29 U.S.C. § 2887. 29 U.S.C. § 2939(a) (2006). Additionally, 5 U.S.C. § 301 (2006) vests the Secretary of Labor with the authority to "prescribe regulations for the government of his department" and "the distribution and performance of its business." 5 U.S.C. § 301 (2006). The Secretary of Labor therefore had broad authority to direct the application of the typical procurement procedures as outlined in the FAR and DOLAR to apply to procurements for Job Corps Center operations.

## B. The Fair Proportion Determination

Plaintiff claims that DOL failed to make the "fair proportion" determination contemplated by 15 U.S.C. § 644(a) (2006). For purposes of this argument, plaintiff assumes that the Rule of Two set-aside process called for by FAR part 19.502-1(a) is not *per se* improper, but that it is independent of a prior determination made under Section 644(a), which assesses whether it is appropriate to contemplate a set-aside in order to maintain a "fair proportion" of small-business participation in a particular industry category.

17

Section 644(a) is found in Title 15 (Commerce), Chapter 14a (Aid to Small Business):

> To effectuate the purposes of this chapter, small-business concerns within the meaning of this chapter shall receive any award or contract or any part thereof, and be awarded any contract for the sale of Government property, as to which it is determined by the Administration and the contracting procurement or disposal agency . . . (3) to be in the interest of assuring that a fair proportion of the total purchases and contracts for property and services for the Government in each industry category are placed with small business concerns . . . . These determinations may be made for individual awards or contracts or for classes of awards or contracts. . . . For purposes of clause (3) of the first sentence of this subsection, an industry category is a discrete group of similar goods and services. Such groups shall be determined by the Administration in accordance with the definition of a "United States industry" under the North American Industry Classification System [NAICS], as established by the Office of Management and Budget . . . .

15 U.S.C. § 644(a).

It is plaintiff's position that this predicate determination as to a "fair proportion" must be made by the contracting officer prior to the set-aside determination made under FAR part 19.502-1(a). It points out that the Rule of Two regulation contains the conjunction "and" when referring to the "fair proportion" determination:

> (a) The contracting officer shall set aside an individual acquisition or class of acquisitions for competition among small businesses when—
>> (1) It is determined to be in the interest of maintaining or mobilizing the Nations full productive capacity, war or national defense programs; or
>> (2) Assuring that a fair proportion of Government contracts in each industry category is placed with small business concerns; *and* the circumstances

> described in 19.502-2 [the "Rule of Two"] . . .
> exist.

48 C.F.R. § 19.502-1(a) (emphasis added).  Plaintiff envisions that prior to any procurement process in any executive agency, the contracting officer would consult with a representative from the OSDBU and consider the current level of small business participation within the industry category and the capacity of those small businesses to take on new contracts prior to determining whether setting aside a particular contract would be in the interest of assuring a fair proportion.  Depending on the outcome, this analysis presumably could render application of the Rule of Two unnecessary.  Plaintiff asserts that the "fair proportion" analysis was not conducted in this case and that had it been conducted, then Shriver may not have been set aside.

Defendant does not disagree that a fair proportion determination has to be made at some level, but argues that it looks very different from the contract-specific process plaintiff calls for.  It contends that the structure of Section 644 suggests that the determination contemplated by Section 644(a) is not made in the context of individual contracts, but is reflected in high level policy judgments made on an ongoing and iterative basis by the President and the heads of agencies.  According to defendant, it should not be assumed that subsection (a) requires any particular form of a determination; Congress was not literally insisting that the contracting officer make a formal study of what impact a particular contract would have on the ratio of small to large businesses in a specific industry category.  Instead, discretion was left to the Executive Branch to work out a means to accomplish an end.  Defendant argues that FAR part 19.502-2, the Rule of Two, is the means by which the Executive Branch has chosen to satisfy the obligation to determine a fair proportion of contracts to be awarded to small businesses.

This position was endorsed by the Comptroller General[10] in *Delex Systems, Inc.*:

> The origin of the Rule of Two predates the FAR; when the FAR
> was promulgated, the Office of Federal Procurement Policy
> (OFPP) prepared a Federal Register notice seeking comments on

---

[10] The Comptroller General was subsequently renamed the Government Accountability Office or GAO.

the rule's inclusion in the new government-wide procurement regulation. 49 Fed. Reg. 40135 (Oct. 3, 1984). This notice explains that the Rule of Two is intended to implement the Small Business Act language in 15 U.S.C. sect. 644(a), quoted above, requiring that small businesses receive a "fair proportion of the total purchases and contracts for property and services for the Government." *Id*. In addition, the notice advised that, in the view of OFPP, "the FAR language complies with current law and reflects the will of the Congress as expressed in the Small Business Act." *Id*. Thus, while the Rule of Two is not specifically set out in the Small Business Act, it has been adopted as the FAR's implementation of the Act's requirements through notice and comment rulemaking.

B-400403, 2008 WL 4570635, at *5 (Comp. Gen. Oct. 8, 2008).

Admittedly, this interpretation assumes that the use of the conjunction "and" in FAR part 19.502-1(a) was merely infelicitous drafting. Nevertheless, we believe that clues within Section 644 itself, as well as within other code provisions, and the difficulties attendant on implementing plaintiff's interpretation, suggest that defendant's interpretation is correct.

Section 644 itself sets up a larger scheme of promoting small-business contracting that seems incompatible with a prior, rigid, contract-by-contract determination by contracting officers of whether a "fair proportion" has been achieved. Subsection (g) of Section 644, for example, calls for the President to set government-wide goals, in percentage terms for small business participation in contracting:

> [t]he President shall annually establish Government-wide goals for procurement contracts awarded to small business concerns . . . . Notwithstanding the Government-wide goal, each agency shall have an annual goal that presents, for that agency, the maximum practicable opportunity for small business concerns.

15 U.S.C. § 644(g). The agency-wide goal will be set by the "head of each Federal agency, after consultation with the Administration." *Id*. § 644(g)(2)(A). The purpose of these goals is to "make consistent efforts to annually expand participation by small business concerns from each industry category in procurement contracts of the agency." *Id*. § 644(g)(2)(D). An

enforcement mechanism of sorts exists in subsection (h), which calls for annual reports to Congress and the President as to the agencies' level of success in meeting goals for small business contracting.  *Id*. § 644(h).

Also integral to the operation of Section 644 is the appointment within each agency of a Director of the Office of Small and Disadvantaged Business Utilization.   The OSDBU monitors performance in meeting goals and encourages "unbundling" contracts to make them more accessible to small businesses.  In addition, one of the roles of the Director of OSDBU is to

> make recommendations to contracting officers as to whether a particular contract requirement should be awarded pursuant to subsection (a) of this section, or section 637(a) of this title or section 2323 of Title 10.  Such recommendations shall be made with due regard to the requirements of subsection (m) of this section, and the failure of the contracting officer to accept any such recommendations shall be documented and included within the appropriate contract file.

*Id*. § 644(k)(10).

The "fair proportion" determination is also inextricably linked to the process by which the Office of Management and Budget creates NAICS industry codes and the SBA's subsequent assignment of size standards for each NAICS code.  When the contracting officer selects "the appropriate NAICS code and related small business size standard and [includes it] in solicitations," 48 C.F.R. § 19.303(a), the effect is to incorporate a judgment made by the SBA as to what the appropriate small-business size standard is for a particular industry category.  This standard can be adjusted, with the result that more or less companies are able to compete as small businesses.

Congress was obviously aware of this interplay between the fair proportion determination and the use of set-asides based on size standards. When Section 644 was amended in 1986 by the National Defense Authorization Act for Fiscal Year 1987, Pub. L. No. 99-661, § 921, 100 Stat. 3816, 3926-30 (1986), to add the requirement that the fair proportion determination be made on an industry category basis, the Report of the House Armed Services Committee noted the following:

21

The Small Business Act requires that a fair proportion of the total purchases and contracts for property and services needed by the Federal Government be placed with small business concerns.   One procedure for accomplishing this objective is the small business set-aside program. . . .

. . . .

. . . . The recommended provision allows the SBA flexibility to evaluate the existing size standards and craft size standards consistent with the objectives of the Act.   The committee has been advised that, in some industries such as the military boot manufacturing industry, only manufacturers exist, all of whom are classified as small businesses.   An inappropriate reduction in size could result in two or three companies being classified as small, leaving the one or two companies not deemed small at a significant disadvantage in bidding those contracts.   In circumstances such as those, the size standard should be reduced to a sufficient degree that all potential offerors with similar capabilities are treated similarly.

H.R. Rep. No. 99-718, at 256, 259 (1986).  This strongly suggests that, even if Section 644 was initially adopted on the assumption that some other device would emerge to implement the "fair proportion" determination, Congress understood that set-asides were being used to accomplish that end.  By then, of course, the Rule of Two was already in place.  *See* 49 Fed. Reg. 40135-01 (Oct. 12, 1984).

In sum, we agree with defendant that the fair proportion determination was satisfied when the Contracting Officer applied the appropriate NAICS size standard, received the endorsement of the OSDBU, and then invoked the Rule of Two.  The mechanisms contemplated by Section 644–goal setting by the Executive Branch, input from the OSDBU, and the industry specific application of size standards by OMB and the SBA–were implemented.  We conclude that nothing more was required to satisfy the "fair proportion" requirement.

Although not necessary to the outcome, we also note that plaintiff was never able to articulate a clear means by which a single contracting officer could make a fair proportion determination in the context of a particular

procurement. Of necessity, this would seem to call for a much broader vantage point, perhaps even outside the agency. Moreover, plaintiff was unable to offer any reasonable likelihood that a remand for a "fair proportion" determination would lead to a different outcome. Arguing that a new determination "might" come out differently would not satisfy the requirement of a non-trivial competitive injury. Nor could plaintiff offer any meaningful guidelines for the court to apply in determining whether the agency's discretion had been abused. Reaching these arguments, however, is unnecessary considering our holding that the fair proportion analysis was conducted in compliance with statute.

C. Application of the "Rule of Two"

Plaintiff's final argument is that the agency was arbitrary and capricious in the way it conducted its Rule of Two analysis. We disagree.

The Rule of Two states that the "contracting officer shall set aside any acquisition over $150,000 for small business participation when there is a reasonable expectation that: (1) Offers will be obtained from at least two responsible small business concerns . . . ; and (2) Award will be made at fair market price." 48 C.F.R. § 19.502-2(b). It is worth highlighting that the rule does not require that the particular companies who respond to the RFI actually be determined responsible. Rather, the test is simply whether it appears likely that, when the solicitation later moves forward, at least two responsible small businesses will appear.

Plaintiff offers several arguments to support the assertion that the Rule of Two decision was arbitrary and capricious. They fall into two categories: those that rely only on the materials that the government contends were properly before the Contracting Officer, i.e., materials related solely to the Shriver Job Corps Center, and those arguments that rely on material related to other Job Corps Centers.

As to the first category, plaintiff contends that Mr. Pendleton's response that set-asides at Shriver and New Haven were "hard to swallow" evinces concerns that call into question the reasonable expectation required under the Rule of Two. Despite his initial reservations, however, Mr. Pendleton determined that a set-aside was reasonable.

23

Plaintiff also asserts that the set-aside decision was not reasonable because the "relevant factors" of capability, capacity, past performance, and award at fair market price were not thoroughly considered. Pl.'s Mot. J. AR 53. Plaintiff borrows the "relevant factors" from the FAR's general standards for determining whether a prospective contractor is "responsible" to be awarded a contract. 48 C.F.R. § 9.104-1; *see* 48 C.F.R. § 9.103.

We begin with the reminder that whether to set aside a solicitation for small businesses "'is a matter of business judgment within the contracting officer's discretion.'" *Gear Wizzard, Inc. v. United States*, 99 Fed. Cl. 266, 282 (2011) (quoting *Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 738 (2007)). The "law does not require any particular method." *Id.*; *see McKing Consulting Corp. v. United States*, 78 Fed. Cl. 715, 724-25 (2007) (holding that the Rule of Two was satisfied when the contracting officer relied on market research and a history of successful procurements conducted as small business set-asides); *Otis Elevator Co.*, B-195873, 1979 WL 11672 at *2 (Comp. Gen. Dec. 19, 1979) (rejecting plaintiff's argument that inadequate past maintenance service by the incumbent small business invalidated the contracting officer's reasonable expectation in the Rule of Two analysis). Crucially, the contracting officer need not make affirmative determinations of responsibility, *Admiral Towing & Barge Co.*, B-291849 *et al.*, 2003 WL 22309106, at *3 (Comp. Gen. March 6, 2003), but need only have "a *reasonable expectation* that: (1) Offers will be obtained from at least two responsible small business concerns . . . ; and (2) Award will be made at fair market prices." 48 C.F.R. § 19.502-2(b) (emphasis added); *see The Protective Group, Inc.*, B-310018, 2007 WL 4097385, at *4 (Comp. Gen. Nov. 13, 2007).

Past acquisition history may be relevant to the Rule of Two analysis, but "it is not the only factor to be considered in determining whether a reasonable expectation exists." 48 C.F.R. § 19.502-2(b)(2). "The contracting officer may consider and base its decision on such factors as prior procurement history, the nature of the contract, market surveys, and/or advice of the agency's small business specialist." *MCS Mgmt., Inc. v. United States*, 48 Fed. Cl. 506, 512, 514 (2000). Additionally, it is not required or practical at this stage of the procurement process for the contracting officer to conduct a full responsibility evaluation. *Fermont Div., Dynamics Corp.*, B-195431, 1980 WL 18035, 59 Comp. Gen. 533, 538-40 (1988). Rather, the contracting officer need only reasonably expect that likely offerors will "be capable of surviving a future responsibility determination." *Greenleaf Const. Co., Inc. v. United States*, 67 Fed. Cl. 350, 358 (2005).

24

The small businesses responding to the RFI furnished the Contracting Officer with substantial narrative descriptions of their experience and prior history on related work. *See* AR 9-67. While it is true that the rationales offered for finding the entities potentially responsible, which were relied on to show a sufficient pool of available small businesses, consisted uniformly of "currently operates JCC," it is not irrational to assume that, "[s]ince these [two] respondents have been awarded [Job Corps Center] contracts it's anticipated that similar small businesses will provide a competitive proposal that is based on fair market price for the operation of the Shriver Job Corps Center." AR 73. While the Rule of Two analysis was not extensive, an extensive analysis was not required.

Plaintiff contends, however, that Mr. Pendleton's analysis was too narrow. It argues that to artificially limit the Rule of Two analysis to what was in front of Mr. Pendleton is to ignore the evidence in the record that suggests that OCM led the decision-making process and had before it all of the information regarding Job Corps Center set-asides occurring contemporaneously across the nation. While it may have been reasonable for Mr. Pendleton to conclude that the Rule of Two was satisfied when two small businesses with operations experience expressed interest in the Shriver center, plaintiff asserts that it was not reasonable when OCM "decided to set-aside 13 [Job Corps Centers] for competition amongst a maximum of three small businesses, which between them operated only four [Job Corps Centers]." Pl.'s Mot. J. AR 50. In support of its position, plaintiff cites material it included as an appendix to its motion for judgment on the administrative record.

The materials outside the record furnished initially by the government consist of notices posted on the Federal Business Opportunities website, including RFIs, Pre-solicitation Notices, Solicitations, and Award Notices for other Job Corps Centers, Outcome Measurement System data that is available on DOL's website, a Master Procurement Schedule for all Job Corps Centers, and set-aside memorandum and OCM internal emails obtained from the administrative records of other cases. If we admitted the material into the administrative record here, it would show, in substance, a pattern of set-asides made in reliance on expressions of interest from a relatively limited pool of small businesses. Plaintiff asks us to remand so that the Contracting Officer may take into consideration all of this material in his set-aside decision. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not

considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it," then the court ought "to remand to the agency for additional investigation or explanation.").

Although at first glance the pattern established by this material might seem problematic, we conclude that it is not the court's role to second guess the agency's decision to rely on the mechanisms it had available to address the problem. For example, after the solicitation, when the contracting officer reviews proposals, he will conduct a responsibility determination pursuant to FAR part 9.104-1, which takes into account all of the bidder's "existing commercial and governmental business commitments," past performance, capacity, and capability. If there are no acceptable offers from responsible small businesses in response to a set-aside, then FAR part 19.502-2(a) states that "the set-aside shall be withdrawn and . . . be resolicited on an unrestricted basis." In addition, if only one offer is received from a responsible small business in response to a set-aside then the contracting officer has discretion to withhold an award. 48 C.F.R. § 19.502-2(a). Even if only one offer is received, moreover, that bidder would have been under the impression that it was in competition with others at the time it priced its proposal. Additionally, if the proposals do not initially reflect a fair market price, then a fair price may be negotiated pursuant to FAR part 15, and "[e]xcept as authorized by law, a contract may not be awarded as a result of a small business set-aside if the cost to the awarding agency exceeds the fair market price." 48 C.F.R. § 19.501(g).

We think it was not irrational to rely on the mechanisms cited above to remedy problems with limited competition. Any other outcome would require the court to speculate about at least four variables: the entities submitting bids, the dates of the solicitations announced by the government, the degree of overlap in the interest by bidders, and finally, the contract performance start dates.

The Rule of Two is part of a larger framework in the FAR established to benefit small businesses. All that is required is a reasonable expectation. The threshold for meeting the criteria of the Rule of Two is purposefully low and is counterbalanced by FAR provisions that provide direction in the event of a failed set-aside. We conclude that, even if the materials related to other Job Corps Centers were in front of us, the result here would be the same. Therefore, we decline to include it in the administrative record because it is not necessary for effective judicial review. *Axiom*, 564 F.3d at 1381 (citing *Camp*

*v. Pitts*, 411 U.S. 138, 142-43 (1973)).  The Contracting Officer's decision to set-aside the Shriver center was not arbitrary and capricious.

## CONCLUSION

For reasons explained above, we deny plaintiff's February 4, 2013 motion to strike and plaintiff's motion of February 4, 2013 for leave to notify the court of defendant's suspension of all Job Corps Center enrollment.  We grant defendant's motion for judgment on the administrative record, and we deny plaintiff's cross-motion.  The clerk is directed to enter judgment accordingly.  No costs.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Judge